FILED
COURT OF APPEALS
DIVISION II

2013 APR -2 AM 8:48

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42319-7-II |
| Respondent, | |
| v. | |
| STEVEN GRANT WILLIAMS, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, J. — Steven Grant Williams appeals his jury trial conviction and exceptional sentence for second degree assault of a child based on his having physically abused his girlfriend's seven-year-old son, DR.[1] Williams argues that (1) during closing argument, the prosecutor committed misconduct by misstating the law and appealing to the jury's passions and prejudices; (2) he (Williams) received ineffective assistance when his trial counsel failed to object to the prosecutor's improper closing argument; and (3) the State presented insufficient evidence to support the three aggravating factors on which the trial court based his exceptional sentence.

---

[1] To protect this juvenile's privacy, we use his initials and refer to his adult caretakers by their first names. We intend no disrespect.

No. 42319-7-II

In his Statement of Additional Grounds (SAG),[2] Williams also asserts that (1) during closing argument, the prosecutor "misinstructed"[3] the jury about the elements of his crime; (2) the State's search warrant was not sufficiently particular in describing the items to be seized from his home; (3) the prosecutor "made up"[4] several allegations against him; and (4) his disciplinary spankings of DR could not constitute criminal assault of a child as a matter of law. Williams also challenges several of the jury's implied findings and raises a number of issues concerning matters outside the trial record. We affirm.

FACTS

I. BACKGROUND

As of summer 2010, seven-year-old DR had been on an Individualized Educational Program since kindergarten: He was having difficulty in school; likely had undiagnosed learning disabilities; could not count to 10, recite his ABC's, or perform work at grade level; and had recently failed first grade. He was stubborn about personal hygiene matters, such as brushing his teeth and showering. With his mother's consent, he had been living with his paternal grandparents for a couple of years.

---

[2] In his SAG, Williams reiterates the ineffective assistance of counsel addressed in his appellant's brief.

[3] SAG at 1.

[4] SAG at 4.

2

In late July 2010, however, DR spent about three weeks with his mother and her boyfriend, Steven Grant Williams. No one else was present in the home at the time.[5] Because DR's mother worked the graveyard shift and slept during the day, Williams became DR's primary caretaker and disciplinarian. DR's mother agreed that Williams could spank DR with an "open palm[ ]" on the buttocks; but she did not allow Williams to use any other forms of discipline. 2 Verbatim Report of Proceedings (VRP) at 208.

Williams soon disapproved of certain aspects of DR's behavior and personal hygiene. According to Williams, DR did not know how to do chores, to put dishes away, to flush the toilet, to brush his teeth, or to wash his hair and penis; DR watched too much TV. 3 VRP at 329. Williams believed it was his duty to correct these "problems" and to help DR "become a productive member of society." 3 VRP at 330.

## A. Second Degree Assault of DR

On the second day of DR's visit, Williams began spanking DR, swatting him four or five times with an open palm on the outside of his pants. When DR appeared unaffected, Williams instructed DR to pull down his pants and then hit him a few more times directly on his bare buttocks. When DR's mother saw the resulting "purple hand prints" and large hand-sized bruise on DR's buttocks, she became very upset and told Williams never to touch DR again. Clerk's Papers (CP) at 52.

---

[5] When DR arrived at his mother's home, he had a burn mark on his leg from an accident at daycare; but he had no other visible markings or bruises on him.

But Williams continued to "spank" DR, hitting him with a belt across his bare arms, back, and buttocks, thinking it would have less "impact";[6] these "spankings," however, also left bruises on DR. When DR did not perform well on his math and reading, Williams "choke[d]" DR several times; Williams once threw DR across the room, causing DR to hit his head on a bookshelf. 1 VRP at 45.

DR's bathing habits particularly bothered Williams, who "fought a lot" with DR about taking showers. 2 VRP at 214. After DR's mother left for work, Williams would wake up DR and make him shower a second time. DR did not like getting his face and hair wet and frequently resisted Williams' attempts to make him shower. According to Williams, DR "went berserk" and kicked Williams in the crotch. 3 VRP at 315. "[F]rustrat[ed]" by DR's resistance, Williams "whipped off" his belt, got within "a foot or so" of DR's body, and gave him a "couple of slaps" him with the belt. 3 VRP at 322, 334.

These bathtime "slaps" eventually escalated to the point where Williams was regularly making DR strip naked in the living room, covering DR's eyes with a bandana, taping his mouth shut with black electric tape, binding his wrists, and hitting DR across his naked front and back with a belt. Williams also shoved DR's head in the toilet, poured cold water over him, and wrote the words "Stop staring" on DR's buttocks because Williams thought it was "funny" and the "bruising from [DR's] butt was healing up." CP at 74, 75.

One morning DR awoke with two black eyes, which DR's mother and Williams could not explain; nor did they not seek medical treatment for him. When DR's grandparents picked him up a couple of days later on August 18, they immediately noticed his black eyes and the

---

[6] CP at 53.

"[m]assive bruising" all over his body. 1 VRP at 85. DR's mother appeared to be "extremely nervous or scared," was acting "defensive," and told DR's grandparents that a vitamin deficiency had caused DR's black eyes. 1 VRP at 70, 85. Extremely concerned, DR's grandparents took him to the hospital.

### B. Medical Exams

Dr. Jonathan Halper thoroughly examined DR. DR's vital signs were normal, but he had bruises and injuries over "almost every part of him," including his scapula, shoulders, back, forearms, clavicle, lower abdomen, legs, penis, and both buttocks; DR also had blood and bruising in both eyes and he was missing a tooth. 1 VRP at 24. The bruises were different colors and appeared to be of varying ages, indicating that DR had sustained the injuries over a period of time. The words "'Stop staring'" had been written in Magic Marker on his DR's buttock. 1 VRP at 28. The hospital photographed DR's bruises. Because DR's bruises and injuries were so extensive, Dr. Halper (1) believed DR had been the "victim of something horrible," likely had been physically assaulted, and bruised as the result of "nonaccidental trauma"[7]; and (2) referred him to Seattle Children's Hospital to receive specialist care.

At Seattle Children's Hospital later that same day, Dr. Kenneth Feldman also examined DR. He confirmed that DR had no broken bones or organ damage but that DR had a "tremendous number of bruises" on the soft body parts, or padded areas, of his body, where children do not normally sustain bruises. 2 VRP at 148. Dr. Feldman (1) observed and photographed the same injuries that Dr. Halper had noted; (2) found additional bruising on DR's

---

[7] 1 VRP at 24, 29.

wrists, hipbone, kneecaps, armpits, shins, inner thighs, ankle, and scrotum; (3) observed a bruise with "patterning" on the shaft of DR's penis, which looked like it had been caused by an "impact[ ] object";[8] (4) noted a "composite bruise"[9] on DR's buttocks, indicating repeated blows; (5) noted that the bruising on DR's eyes would have similarly resulted from "separate blows to each eye";[10] and (6) ruled out any preexisting medical reasons, such as a bleeding disorder, for DR's bruises. When asked how the bruises had started, DR replied to Dr. Feldman, "When he [Williams] gets mad." 2 VRP at 143. DR also told Dr. Feldman how Williams had taped his (DR's) mouth shut, bound his wrists together, placed electric tape over his eyes, dunked his head in cold water, shoved his head in a toilet, and beaten him repeatedly with a belt. Based on the distribution and character of DR's bruises and DR's disclosures, Dr. Feldman was "100 percent" certain that DR had been abused. 2 VRP at 149.

### C. Investigation

The next day, DR's grandparents took him to Olympia for two child forensic interviews, during which he made similar disclosures. DR stated that (1) Williams had put him in cold shower to help him "[b]e nice . . . , not fuss, [and] not be . . . a cry baby";[11] (2) he (DR) had gotten his bruises from being "spanked";[12] (3) he had been "slapped silly";[13] and (4) Williams

---

[8] 2 VRP at 154.

[9] 2 VRP at 155.

[10] 2 VRP at 169.

[11] 2 VRP at 247.

[12] 1 VRP at 95.

had grabbed him by the throat and choked him while stating, "Stop it or I'll f*cking kill you,"[14] and, "[I]f you keep that up I'm going to kill you." 1 VRP at 97.

The police obtained a search warrant for Williams' home, where they discovered several belts strewn throughout the rooms, duct tape on the bathroom floor, and black electrical tape with cotton in the kitchen trashcan. VRP at 97-98, 100, 102-03, 106-09. Based on this evidence and DR's disclosures, the police arrested Williams for child abuse and read him his *Miranda*[15] rights.

Williams waived his rights and gave a statement to the police. Williams claimed that he was at his "f*cking wits end, trying to get [DR] to clean himself properly"[16] and admitted that he had (1) pushed DR's head toward to toilet when he did not flush, (2) restrained DR in the shower, (3) grabbed DR's head and told him to "stop acting like a little *sshole and get in the water,"[17] (4) spanked DR hard enough to leave "purple hand prints"[18] on his buttocks, (5) tried to "remove" the handprint bruises on DR's buttocks by using a hairbrush to rub lotion on the bruises, and (6) written on DR's buttocks. CP at 74. Williams laughed frequently about DR's hygiene, stating that DR's hair smelled like "feces" and that he had "never seen the head of his

---

[13] 1 VRP at 95.

[14] 2 VRP at 253.

[15] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[16] CP at 60.

[17] CP at 42.

[18] CP at 52.

d*ck before." CP at 46. Williams repeatedly minimized DR's injuries and asserted that he (Williams) had experienced the same, or worse, injuries as a child.

## II. PROCEDURE

The State charged Williams with second degree assault of a child. It also alleged three aggravating sentencing factors: that Williams (1) had known or should have known DR was particularly vulnerable or incapable of resistance, contrary to RCW 9.94a.535(3)(b);[19] (2) had demonstrated deliberate cruelty toward DR, contrary to RCW 9.94A.535(3)(a); and (3) had displayed an egregious lack of remorse, contrary to RCW 9.94A.535(3)(q).

### A. Trial

The State's witnesses testified about the previously described facts. The trial court accepted into evidence the photographs of DR's bruises and a transcript from Williams' police interrogation. Williams testified that (1) DR's grandmother had "spoiled him" and had failed to teach him any of the "life lessons" he needed;[20] (2) he (Williams) found DR's resistance to showering "frustrating";[21] and (3) aside from someone in a "mental ward," he (Williams) had not seen a person react as violently or reach the same "degree of animal savagery" as DR when showering. 3 VRP at 332. Williams admitted having stated that DR's hair smelled like "feces";[22] having to restrain DR physically and to force him into the shower; getting angry and

---

[19] The Legislature amended this statute in 2011, but the amendments do not affect our analysis in this opinion.

[20] 3 VRP at 329, 330.

[21] 3 VRP at 334.

[22] 3 VRP at 311.

spanking DR several times, with his palm and belt making direct contact with DR's skin; leaving "handprints" and bruises on DR's buttocks; writing on his (DR's) buttocks; and knowing that DR had two black eyes. 3 VRP at 319. But Williams denied knowing how DR's black eyes had occurred, making DR take cold showers, throwing DR into a bookshelf, and spanking him anywhere besides on his buttocks.

During the State's closing argument, the prosecutor discussed the physical and emotional abuse that DR had suffered and how it had escalated over time:

> This violence escalated over the weeks he was there, started out with spanking, then moved on to that belt, and then a couple days before [DR] leaves he gets this massive head injury. *It's getting worse as he went along. It's a good thing that it ended when it did.*

3 VRP at 374 (emphasis added). Williams neither objected to this argument nor requested a curative instruction.

Discussing the reasonable doubt instruction's "abiding belief" language, the prosecutor argued:

> [T]o be convinced beyond a reasonable doubt, you do not have to be convinced beyond all doubt. Reasonable doubt is not 100 percent. If reasonable doubt really was 100 percent, we would never convict anyone of anything. . . . Just because a scenario is possible doesn't make it reasonable. So when you're trying to figure out whether a doubt you have might be reasonable or not, just because it's possible doesn't make it reasonable. It's possible I might win the lottery tomorrow. It's not reasonable to think that's going to happen, though.
> The question is do you have an abiding belief that this happened. *Abiding belief is something you can know in your mind, something you can get from your heart, or something you can know in your gut.* Do you have an abiding belief that this happened.

3 VRP at 430-31 (emphasis added). Again, Williams neither objected nor requested a curative instruction.

No. 42319-7-II

Williams then argued in closing that the evidence was insufficient to convict him, repeatedly stating that the jury could not "speculate" in the context of emphasizing the lack of direct evidence of substantial bodily harm:

> [Instruction] 11 talks about substantial bodily harm. And one of the aspects of it [is] there has to be substantial loss or impairment of a function of any bodily part or organ. Now, [the State] has said [DR's] eyes [were] swollen and, therefore, it impaired his vision. Where is the evidence of that? You know, he says, well, look at his eyes, you can see they're swollen and, therefore, it has to impair his vision. *You're not allowed to speculate and that's exactly what the prosecutor is asking you to do, speculate. A lot of his closing had to do with speculate. You know, you can't do it.*

3 VRP at 446-47 (emphasis added).

Treating Williams' "speculation" argument as implying that the jury could not draw reasonable inferences from the evidence, the State argued in rebuttal:

> The simplest explanation is that [Williams] beat the living daylights out of [DR] for those three weeks. *Counsel says you can't speculate. That's not accurate. In fact, the instructions suggest you're supposed to use your common sense.*
> [. . .]
>  *Instruction number three suggests this when it talks about circumstantial evidence.* Circumstantial evidence is facts or circumstances for which the existence or nonexistence of other *facts may be reasonably inferred* from common experience. *So you can decide the facts are present when you look at the evidence and use your common experience. So to say you can't speculate, that's not accurate.*

3 VRP at 465 (emphasis added). Again, Williams neither objected to this argument nor requested a curative instruction.

### B. Judgment and Sentence

The jury convicted Williams of second degree assault and returned special verdicts finding that the State had proven all three aggravating sentencing factors beyond a reasonable doubt. Based on these aggravating factors, the State asked the trial court to impose an

exceptional sentence of 102 months of confinement. VRP (June 27, 2011) at 2. Noting his lack of prior criminal history, Williams asked the trial court to impose 31 months of confinement, the bottom end of the standard sentencing range. VRP (June 27, 2011) at 3. When the trial court asked if Williams would like to make a personal statement, he replied:

> Well, Your Honor, in consideration of everything that I'm already losing because of this conviction, I think that [102 months] is a bit excessive. My entire retirement, my career, my entire identity from the age of 17 on is now taken away from me. So a lengthy prison term . . . seems to me excessive.

VRP (June 27, 2011) at 4. Remarking that Williams' personal statement supported the jury's special verdict finding about his egregious lack of remorse, the trial court imposed an exceptional sentence of 102 months of confinement. VRP (June 27, 2011) at 4-5. The trial court entered findings that (1) "each of these aggravating factors by themselves would justify the sentence," and (2) it would "impose . . . the same sentence *even if there was just one*" of the three aggravating factors. VRP (June 27, 2011) at 5 (emphasis added). Williams appeals.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT

For the first time on appeal, Williams argues that the prosecutor committed misconduct by appealing to the jury's passions and prejudices and by misstating the law in closing argument.[23] Holding that Williams has failed to meet the burden necessary to avoid his procedural default below, we do not address the substance of his prosecutorial misconduct argument beyond that necessary to evaluate the applicable standard of review. His related ineffective assistance of counsel argument also fails.

---

[23] In a related argument, Williams also contends that his trial counsel rendered ineffective assistance in failing to object to this prosecutorial misconduct. We address this argument later.

11

A. Failure To Object and To Request Curative Instruction Below

A defendant claiming prosecutorial misconduct bears the burden of proving that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008); *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d 646 (2006). A prosecutor has wide latitude in closing arguments to draw reasonable inferences from the facts in evidence and to express such inferences to the jury. *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006); *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003). We review any allegedly improper closing argument statements "within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." *Dhaliwal*, 150 Wn.2d at 578. A prosecutor's improper comments are prejudicial "only where 'there is a substantial likelihood the misconduct affected the jury's verdict.'" *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (emphasis omitted) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998)). Such is not the case here.

In addition, where, as here, a defendant did not object to a prosecutor's allegedly improper comment and request a curative instruction at trial, he waives a prosecutorial misconduct claim raised for the first time on appeal unless he can also show that the comment "was so flagrant [and] ill-intentioned that an instruction could not have cured the prejudice." *State v. Corbett*, 158 Wn. App. 576, 594, 242 P.3d 52 (2010) (citing *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995)). Williams fails to meet this burden here.

1. Alleged appeal to jury passions or prejudices

Williams first argues that the prosecutor improperly appealed to the jury's passions and prejudices in (1) summarizing how Williams' abuse had intensified over the three-week period—from spanking DR with an open hand to giving him two black eyes; and (2) then arguing, "'It's getting worse as he [Williams] went along. It's a good thing it ended when it did.'" Br. of Appellant at 21 (quoting 3 VRP at 374). This was not improper argument.

Prosecutors have a duty to "'seek a verdict free of prejudice and based on reason.'" *State v. Echevarria*, 71 Wn. App. 595, 598, 860 P.2d 420 (1993) (quoting *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968)). Thus, prosecutorial appeals to jury passion and prejudice are improper. [24] *See State v. Claflin*, 38 Wn. App. 847, 850-51, 690 P.2d 1186 (1984). Viewed in

---

[24] For example, a prosecutor arguably engages in prosecutorial misconduct if he "'appeals to jurors' fear and repudiation of criminal groups'" or argues "that the jury should convict in order to protect the community, deter future law breaking, or other reasons unrelated to the charged crime." *State v. Ramos*, 164 Wn. App. 327, 338 n.3, 263 P.3d 1268 (2011) (quoting *State v. Perez-Mejia*, 134 Wn. App. 907, 916, 143 P.3d 838 (2006).

Williams argues that the prosecutor's closing argument improperly appealed to the jury's passions because it "appeal[ed] to the community conscience" that inflamed the jurors' emotions, urging them to convict Williams to protect children from future abuse. Br. of Appellant at 24. Williams' reliance on *Perez-Meija* and *Ramos* is not helpful. In *Perez-Meija*, Division One of our court held that a prosecutor committed misconduct by repeatedly telling the jury that it should "pick up the torch" and "[s]end a message" to gang members that gang violence will not be tolerated and that such violence offends the values recognized in the Declaration of Independence; the prosecutor also "called further unnecessary attention to the defendant's ethnicity." *Perez-Meija*, 134 Wn. App. at 917-18. Similarly, in *Ramos*, Division One again held that the prosecutor committed misconduct in arguing that the jury should convict the defendant, charged with an isolated drug crime, to "protect the community" and to "prevent 'the coke dealers' from engaging in 'drug activity' at Sunset Square." *Ramos*, 164 Wn. App. at 337, 338. The court further noted that this improper argument was "not based on the evidence." *Ramos*, 164 Wn. App. at 340.

Unlike *Ramos* and *Perez-Meija*, the prosecutor's statements here did not appeal to the jury's civil or patriotic obligations to "protect the community" or "to send a message" to

13

the context of the prosecutor's entire argument, the evidence, issues in the case, and the trial court's instructions, the prosecutor's comments here about the escalating nature of Williams' abuse of DR and the physical and emotional harm that this abuse had caused him were not improper. Moreover, Williams fails to show that any arguable prejudice could not have been cured by a jury instruction, which he did not request. Williams' failure to show that the prosecutor's argument "was so flagrant [and] ill-intentioned that an instruction could not have cured the prejudice"[25] precludes our further consideration of his unpreserved prosecutorial misconduct claim on this ground.

### 2. Alleged misstatements of law

#### a. "Heart" and "gut"; "speculation"

Similarly, Williams fails to meet his burden for challenging the prosecutor's closing argument explanation that "[r]easonable doubt is not 100 percent" and his comment that "[a]biding belief is something you can know in your mind, *something you can get from your heart, or something you can know in your gut.*" 3 VRP at 430, 431 (emphasis added). Even if the comments about the jurors' relying on their "hearts" and "guts" were arguably improper, again, they were not "so flagrant [and] ill-intentioned that an instruction could not have cured the prejudice."[26] *Corbett*, 158 Wn. App. at 594. Williams failed not only to object but also to request such a curative instruction.

---

criminals like Williams, who might also abuse children. Nor did the prosecutor's statements refer to facts not in evidence or seek a conviction for reasons unrelated to the charged crime.

[25] *Corbett*, 158 Wn. App. at 594.

[26] See related analysis in the ineffective assistance of counsel section, *infra.*

Williams similarly fails to meet this burden for his claim that the prosecutor misstated the law and encouraged the jury to consider facts not in evidence by arguing in rebuttal that the jury could engage in "speculation." Br. of Appellant at 26. First, the prosecutor did *not* invite the jury to engage in speculation; instead, he was attempting to explain that the jury could use common sense to infer facts from circumstantial evidence in the absence of the direct evidence that Williams had argued was missing.[27] We note, however, that, taken out of context, the prosecutor's comment about "speculation" could be construed as a misstatement of the law. But, even assuming the prosecutor's argument was a misstatement of the law, Williams fails to show that this comment was "so flagrant [and] ill-intentioned that an instruction could not have cured the prejudice." *Corbett*, 158 Wn. App. at 594. Again, Williams failed not only to object but also to request such a curative instruction.

Thus, we hold that Williams waived his prosecutorial misconduct argument for these two unpreserved alleged misstatements of the law because he fails to show that the comments were "so flagrant [and] ill-intentioned that an instruction could not have cured the prejudice." *Corbett*, 158 Wn. App. at 594.

---

[27] More specifically, the prosecutor argued:

> *Counsel says you can't speculate. That's not accurate. . . . In fact, the instructions suggest you're supposed to use your common sense.*
> [. . .]
> *Instruction number three suggests this when it talks about circumstantial evidence.* Circumstantial evidence is facts or circumstances from which the existence or nonexistence of other facts may be reasonably inferred from common experience. *So you can decide the facts are present when you look at the evidence and use your common experience. So to say you can't speculate, that's not accurate.*

3 VRP at 465 (emphasis added).

b. SAG: second degree assault elements

In his SAG, Williams asserts that the prosecutor "knowingly misinstructed the jury" about the elements of second degree assault of a child because he stated that Williams needed to have had "engaged in a pattern or practice of assaulting the child" in order to convict. SAG at 1. Our review of the record discloses no such instances where the prosecutor instructed the jury that it needed to find that Williams had engaged in a "pattern or practice" of assault. On the contrary, the prosecutor discussed Instruction 4, noting that, although Williams had bruised DR several times over the course of three weeks, the jury needed to "be sure that *on at least one occasion* [Williams] ha[d] committed assault in the second degree." 3 VRP at 438 (emphasis added).

We further note that the trial court properly instructed the jury on the elements of second degree assault of a child and that the jury should follow the court's instructions about the law, not counsel's arguments and statements. "A jury is presumed to follow the court's instructions." *State v. Foster*, 135 Wn.2d 441, 472, 957 P.2d 712 (1998). We hold that the prosecutor did not "misinstruct"[28] the jury on the elements of second degree assault of a child.

3. Additional SAG allegations of prosecutorial misconduct

Williams also asserts in his SAG that the prosecutor (1) repeatedly characterized Williams as "frustrated" without explaining or offering into evidence why and (2) "made up" that Williams had "pushed" DR's head in the toilet. SAG at 3, 4, 5. The record does not support these assertions. On the contrary, Williams testified at trial that he was "frustrate[ed]" about DR's resisting showers. 3 VRP at 334. He also admitted in his police interview that he had

---

[28] SAG at 1.

16

pushed DR's head toward the toilet when DR did not flush. The prosecutor's statements, thus, were neither "made up"[29] nor improper argument.

## B. Effective Assistance of Counsel

In a related argument, in both his appellant's brief and his SAG, Williams contends that his trial counsel provided ineffective assistance in failing to object to the prosecutor's improper closing and rebuttal argument comments.[30] This argument also fails.

A claim of ineffective assistance of counsel presents mixed questions of law and fact, which we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). A failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). Williams fails to meet his burden here.

---

[29] SAG at 4.

[30] In his SAG, Williams also asserts that his trial court provided ineffective assistance by (1) "failing to utilize the questions" Williams asked; (2) fail[ing] to investigate information Williams provided related to his case; and (3) telling Williams that he (Williams' trial counsel) was "burned out" and that he "didn't know how long he could keep practicing law." SAG at 18-19. Because these ineffective assistance of counsel claims involve matters outside the record, Williams must raise them in a personal restraint petition, not on direct appeal. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Therefore, we do not further consider these claims.

### 1. Deficient performance prong

To prove deficient performance, a defendant must overcome "'a strong presumption that counsel's performance was reasonable.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)), *adhered to in part on remand*, 168 Wn. App. 635, 278 P.3d 225 (2012). "'When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Grier*, 171 Wn.2d at 33 (quoting *Kyllo*, 166 Wn.2d at 863).

As we previously explained, the prosecutor did not engage in improper closing argument when he (1) stated that Williams' abuse was "getting worse as he went along. It's a good thing that it ended when it did";[31] (2) characterized Williams as "frustrated";[32] and (3) argued that Williams pushed DR's head in toilet. Nor did the prosecutor engage in improper argument by "misinstruct[ing]" the jury about the elements of second degree assault of a child. SAG at 1. Because these prosecutor closing statements were not improper, Williams' counsel was not deficient in failing to object. *State v. Larios-Lopez*, 156 Wn. App. 257, 262, 233 P.3d 899 (2010). Thus, these alleged instances of prosecutorial misconduct do not support Williams' ineffective assistance argument.[33]

We next address Williams' argument that his counsel was ineffective in failing to object when the prosecutor argued in rebuttal:

---

[31] 3 VRP at 374.

[32] 3 VRP at 384.

[33] Because Williams fails to establish the first prong of the ineffective assistance of counsel test for these prosecutor statements, we do not address the second prong for these statements.

> Counsel says you can't speculate. That's not accurate. . . . In fact, the instructions suggest you're supposed to use your common sense . . . . [Y]ou can decide the facts are present when you look at the evidence and use your common experience. *So to say you can't speculate, that's not accurate.*[34]

3 VRP at 465 (emphasis added). As we previously explained, for the most part, these rebuttal argument comments were a fair response to Williams' inaccurate suggestion to the jury that drawing reasonable inferences from the evidence was impermissible because it required that they "speculate."[35]

> "As a general rule, remarks of the prosecutor, including such as would otherwise be improper, are *not grounds for reversal where they are invited, provoked, or occasioned by defense counsel* and where [the comments] are in reply to or retaliation for [defense counsel's] acts and statements, unless such remarks go beyond a pertinent reply and bring before the jury extraneous matters not in the record, or are so prejudicial that an instruction would not cure them."

*State v. Davenport*, 100 Wn.2d 757, 761, 675 P.2d 1213 (1984) (emphasis added) (emphasis omitted) (alteration in original) (quoting *State v. La Porte*, 58 Wn.2d 816, 822, 365 P.2d 24 (1961)). Here, Williams "invited" and "provoked" the prosecutor's "speculation" rebuttal comments, made in the context of explaining the court's instruction that, even when there was no direct evidence of a fact, it was permissible for the jury to infer facts from circumstantial evidence.

Nevertheless, as we acknowledge earlier in this opinion, when taken out of context, the prosecutor's latter statement—that defense counsel inaccurately said the jury could not "speculate"—arguably could have warranted a defense objection. We cannot tell from the

---

[34] In between these two comments about speculation, the prosecutor attempted to explain the court's Instruction 3 and the difference between direct and circumstantial evidence.

[35] 3 VRP at 445.

record, however, whether defense counsel might have had a legitimate strategic reason for not objecting. But even assuming, without deciding, a lack of defense strategy, we turn to the second prong of the ineffective assistance of counsel test to determine whether Williams has shown prejudice.

## 2. Prejudice prong

To show prejudice, the defendant must establish that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). A failure to prove either prong ends our inquiry. *Hendrickson*, 129 Wn.2d at 78. Williams, however, fails to meet the prejudice prong of his ineffective assistance challenge based on counsel's failure to object to the prosecutor's (1) "speculation" comments and (2) statements that the jury could rely on their "heart" and "gut" in interpreting the reasonable doubt standard.[36] 3 VRP at 431. Again, we note that the trial court instructed the jury:

> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. . . . *The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.*

CP at 114 (Instruction 1) (emphasis added). And, again, we presume that the jury followed the court's instructions. *Foster*, 135 Wn.2d at 472. Instruction 1, combined with the trial court's

---

[36] We have already held in a previous section of our analysis that these "heart" and "gut" comments were not ill-intentioned and flagrant in the context of deciding that Williams fails to meet his burden to challenge these comments for the first time on appeal. Nevertheless, for purposes of our assistance of counsel analysis here, we assume, without deciding, that these comments were improper.

reasonable doubt and circumstantial evidence instructions (Instructions 2 and 3) substantially mitigated any prejudice that Williams might arguably have suffered from the prosecutor's improper comments and misstatements of the law.

Furthermore, the evidence against Williams was overwhelming: Williams admitted being "frustrate[ed]" when DR resisted taking a shower, restraining DR, spanking him hard enough to leave "purple hand prints" on his buttocks, pushing his head toward the toilet, calling him a "little a\*\*hole," and writing on his buttocks. 3 VRP at 334; CP at 42, 52. Several doctors, police officers, and social workers corroborated DR's testimony that Williams had engaged in this abusive conduct. The jury saw numerous photographs of DR's bruises, belts that Williams had used to beat DR, and electrical tape and duct tape that police had recovered from Williams' home. Dr. Feldman testified that DR's injuries were not the result of preexisting medical disorders and that he was "100 percent" certain that DR had been abused. 2 VRP at 149. The evidence further showed that Williams was DR's caretaker while his mother worked the night shift and slept during the day, making Williams the *only* available and likely person to have inflicted DR's injuries.

Based on the strength of the State's evidence and the trial court's instructions to the jury, Williams fails to show that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). Because Williams fails to demonstrate prejudice, we hold that his ineffective assistance of counsel claim also fails.

## II. Sufficient Evidence To Support Exceptional Sentence Factors

Williams next challenges the trial court's imposition of an exceptional sentence. He argues that insufficient evidence supports the jury's finding of three aggravating sentencing factors: (1) that he had known or should have known that DR was particularly vulnerable, (2) that he had demonstrated deliberate cruelty toward DR, and (3) that he had displayed egregious lack of remorse.[37] The record does not support Williams' argument. We further note that any one of these three factors standing alone would support Williams' exceptional sentence and that the trial court so stated on the record.

### A. Standard of Review

A trial court may sentence a defendant to an exceptional sentence above the standard range if (1) the jury enters a special verdict, finding beyond a reasonable doubt one or more aggravating factors alleged by the State; and (2) the trial court determines that the facts found are substantial and compelling reasons justifying an exceptional sentence. RCW 9.94A.535;[38] RCW

---

[37] Williams also argues that, because he was not convicted of a sex crime, the trial court erred in considering his "future dangerousness" when imposing his exceptional sentence. Br. of Appellant at 18. Williams is correct that future dangerousness is a non-statutory aggravating factor that may support an exceptional sentence only in a sexual offense case. *State v. Halgren*, 137 Wn.2d 340, 346, 971 P.2d 512 (1999). But the trial court did not use future dangerousness to justify imposing Williams' exceptional sentence here.

Rather, the trial court stated, as an aside, that Williams' sentence was "meant to punish [him] and to protect other kids" from him; the trial court did not reduce these statements to formal findings or include them in its written findings of fact and conclusions of law justifying Williams' exceptional sentence. VRP (June 27, 2011) at 5-6. Nor does Williams cite anything in the record showing that the trial court relied on these statements in imposing his exceptional sentence. Therefore, we do not further consider this argument.

[38] The Legislature amended this statute in 2011, but the amendments do not affect our analysis in this opinion.

9.94A.537(3), (6); *State v. Stubbs*, 170 Wn.2d 117, 123, 240 P.3d 143 (2010). To reverse such an exceptional sentence, we must find either that the record does not support the sentencing court's articulated reasons, that those articulated reasons do not justify a sentence outside the standard sentence range for that offense, or that the length of the exceptional sentence was clearly excessive.[39] RCW 9.94A.585(4).

We review the jury's special verdict findings for a sufficiency of the evidence, *Stubbs*, 170 Wn.2d at 123. Under this standard, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the presence of the aggravating circumstances beyond a reasonable doubt. *State v. Chanthabouly*, 164 Wn. App. 104, 143, 262 P.3d 144 (2011), *review denied*, 173 Wn.2d 1018 (2012). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Moles*, 130 Wn. App. 461, 465, 123 P.3d 132 (2005). We defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874–75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

B. Egregious Lack of Remorse

The State presented sufficient evidence (1) to support the jury's special verdict finding that Williams "demonstrate[d] or display[ed] an egregious lack of remorse"[40] and (2) to justify

---

[39] Williams does not challenge the length of the trial court's exceptional sentence as "clearly excessive" under RCW 9.94A.585(4)(b).

[40] CP at 146.

the trial court's imposition of an exceptional sentence under RCW 9.94A.535(3)(q). Refusing to admit guilt or remaining silent is an exercise of one's rights, not an indication of lack of remorse. *State v. Russell*, 69 Wn. App. 237, 251, 848 P.2d 743 (1993). Thus, ordinary lack of remorse is insufficient to support this aggravating factor; instead, a defendant's lack of remorse must be of an "aggravated" or "egregious" character. *State v. Wood*, 57 Wn. App. 792, 800, 790 P.2d 220, *review denied*, 115 Wn.2d 1015 (1990). Whether a sufficient quantity or quality of remorse is present depends on the facts of the case. *State v. Ross*, 71 Wn. App. 556, 563, 861 P.2d 473 (1993), 883 P.2d 329, *review denied*, 123 Wn.2d 1019 (1994).

In *Ross*, we upheld a trial court's exceptional sentence based on egregious lack of remorse where Ross continued to "blame the justice system" for his crimes and the trial court did not find him credible when he said "he was sorry." *Ross*, 71 Wn. App. at 563. Similarly in *Wood*, we upheld an exceptional sentence based on a showing of egregious lack of remorse where Wood joked with her husband's killer (her boyfriend) about the gurgling sounds that her husband had made when he was shot and she had moved in with her boyfriend three weeks after her husband's death. *Wood*, 57 Wn. App. at 795, 800. And in *Russell*, we held that the record sufficiently supported the egregious lack of remorse aggravating factor where Russell had hidden his pain-inflicted child-victim in a bedroom, prevented him from receiving medical treatment, insisted on cleaning up the victim's bedroom before the police arrived, and was willing "'to party'" a few days after the victim's death. *Russell*, 69 Wn. App. at 251.

Williams also tried to hide his abuse of DR: Williams routinely waited for DR's mother to leave before waking up DR to shower, when most of the abuse occurred; Williams made varying excuses for DR's eye injuries; and he admitted having tried to remove the bruises on

DR's buttocks with lotion and a hairbrush. Williams had frequently belittled DR, calling him derogatory names like "little *a**hole" and writing the words "stop staring" on his buttocks because the bruises were "healing" and he thought it was "funny." CP at 42, 75; 2 VRP at 219. Williams minimized DR's injuries, stating that he (Williams) had suffered worse injuries as a child. At Williams' sentencing, he (1) expressed virtually no remorse for his actions; and (2) focused solely on what *he* was "losing"[41] and the negative effects that his conviction and sentence would have on his own life. We hold that sufficient evidence supports Williams' egregious lack of remorse, which aggravating factor justified Williams' exceptional sentence.

## C. Deliberate Cruelty

The State also presented sufficient evidence (1) to support the jury's special verdict finding that Williams' conduct during the commission of the crime "manifested deliberate cruelty to the victim"[42] and (2) to justify the trial court's imposition of an exceptional sentence under RCW 9.94A.535(3)(a). Deliberate cruelty is "gratuitous violence or other conduct, significantly more serious or egregious than typical of the crime, which inflicts physical, psychological or emotional pain as an end in itself." *Russell*, 69 Wn. App. at 253. Deliberate cruelty exceeds that normally associated with the commission of a charged offense or that which is inherent in the elements of the offense. *State v. Gordon*, 172 Wn.2d 671, 680-81, 260 P.3d 884 (2011) (citing *State v. Tili*, 148 Wn.2d 350, 369, 60 P.3d 1192 (2003)).

---

[41] VRP (June 27, 2011) at 4.

[42] CP at 148.

Williams contends that because RCW 9A.36.130 (second degree child assault) contemplates "torture" as a means of assault, the jury could not find deliberate cruelty as an aggravating factor because this factor relied on the same facts that were necessary to prove the underlying assault. Br. of Appellant at 10. We previously rejected a similar argument that a deliberate cruelty aggravating factor was improper,[43] reasoning that "even where a statute proscribes behavior that generally could be described as deliberately cruel, it remains possible for a defendant to engage in gratuitous violence more egregious than typical." *Russell*, 69 Wn. App. at 253.

We held that there was sufficient evidence to support Russell's deliberate cruelty aggravating factor because it was possible to commit his homicide-by-abuse crime by "more passive, less violent means" than those used by Russell, who had deliberately and severely beaten a 20-month-old child with brass knuckles, ruptured the child's liver, and denied him medical assistance. *Russell*, 69 Wn. App. at 253-54. We also upheld Ross's deliberate cruelty aggravating factor where he had murdered his victim by inflicting an "extraordinarily high number of wounds, cuts and marks," which were more than necessary to kill the victim. *Ross*, 71 Wn. App. at 562.

Here, Williams inflicted an extraordinarily high number of extreme injuries and bruises on DR, evidenced by the "[m]assive bruising" on all parts of DR's body, the "composite bruise" on his buttocks, and his two black eyes, which had resulted from "separate blows to each eye." 1 VRP at 85, 2 VRP at 155, 169. Williams' conduct also exceeded that which was necessary to

---

[43] Russell argued that his homicide by abuse crime required a "pattern or practice of assault or torture and extreme indifference to human life." *Russell*, 69 Wn. App. at 253.

commit simple assault on a child in that Williams routinely made DR strip naked, bound his wrists, covered his eyes, taped his mouth shut, dunked his head in cold water, shoved his head in a toilet, and hit him indiscriminately with a belt over all parts of his naked body. It is beyond dispute that there are more passive, less violent means of assaulting a child that qualify as second degree assault under RCW 9A.36.130 without manifesting deliberate cruelty. We hold, therefore, that sufficient evidence supports that Williams' assaults of DR manifested deliberate cruelty, which aggravating factor justified Williams' exceptional sentence.

### D. Particularly Vulnerable Victim

The State also presented sufficient evidence to support the jury's special verdict finding that DR was particularly vulnerable, despite Williams' arguments that (1) DR's age was an element already contemplated by the abuse of a child statute; and (2) DR was "an articulate seven year old who could have told his mother or grandmother about the abuse" and, thus, was not particularly vulnerable due to extreme youth. Br. of Appellant at 16. We agree with the State that age is not the only factor in determining victim vulnerability and that the jury could infer DR's vulnerability based on the circumstances of the crime.

A trial court may impose an exceptional sentence based on a jury's finding that the defendant "knew or should have known that the victim . . . was particularly vulnerable or incapable of resistance." RCW 9.94A.535(3)(b). To prove a victim's vulnerability as such an aggravating factor, the State must show (1) that the defendant knew or should have known (2) of the victim's particular vulnerability and (3) that the vulnerability was a substantial factor in accomplishing the crime. *State v. Suleiman*, 158 Wn.2d 280, 291–92, 143 P.3d 795 (2006). To be a substantial factor, the victim's disability must have rendered the victim "'more vulnerable to

the particular offense than a nondisabled victim would have been.'" *State v. Mitchell*, 149 Wn. App. 716, 724, 205 P.3d 920 (2009) (quoting *State v. Jackmon*, 55 Wn. App. 562, 567, 778 P.2d 1079 (1989)), *aff'd*, 169 Wn.2d 437, 237 P.3d 282 (2010).

Generally, the victim's age does not justify an exceptional sentence when age constitutes an element of the crime and, thus, has already been factored into the sentencing guidelines. *State v. Garibay*, 67 Wn. App. 773, 778, 841 P.2d 49 (1992), *abrogated on other grounds by State v. Moen*, 129 Wn.2d 535, 919 P.2d 69 (1996). But even when age is an element of the crime, a victim's age "may also be used as [a] justification for departure from the standard sentencing range if the extreme youth of the victim in fact distinguishes the victim significantly from other victims of the same crime." *Garibay*, 67 Wn. App. at 779. For example, the Washington Supreme Court upheld an indecent liberties victim-vulnerability aggravating factor where the statute contemplated a wide-range of victims (0-14 years old) and the victim was a 5 1/2 year-old boy at a local swimming pool, who trusted the defendant enough to go to the bathroom with him because it was reasonable to conclude that the child's young age rendered him particularly vulnerable and incapable of resistance. *State v. Fisher*, 108 Wn.2d 419, 421, 424-25, 739 P.2d 683 (1987). In contrast, in *State v. Woody*, Division Three of our court held that a seven-year-old school-aged victim of indecent liberties was not particularly vulnerable because "grade-school age children are regarded as having achieved a level of reason that sets them apart from younger children." *State v. Woody*, 48 Wn. App. 772, 777, 742 P.2d 133 (1987), *review denied*, 110 Wn.2d 1006 (1988).

Williams argues that, like Woody's victim, DR was not particularly vulnerable based on his age because he, too, was seven years old, of school age, and in the "middle of the age range"

contemplated by the child assault statute, which by definition contemplates victims under age 13. Br. of Appellant at 16 (citing RCW 9A.36.130). Here, however, DR's age is not the only factor contributing to his particular vulnerability; DR's potential learning disabilities and the other circumstances of Williams' crimes rendered DR particularly vulnerable to abuse.

Although most cases dealing with victim vulnerability have involved extreme youth, advanced age or disability, caregivers, family relationships, or sleeping victims, vulnerability can also result from "characteristics other than the victim's physical condition or stature." *Ross*, 71 Wn. App. at 565. For example, we upheld an aggravating factor based on victim vulnerability where the evidence showed that the defendant had purposefully selected his female robbery and murder victims when they were "alone in offices open to the public" because such circumstances made them particularly vulnerable to his attacks. *Ross*, 71 Wn. App. at 565-66. Similarly, the Washington Supreme Court held that there was sufficient evidence to support the victim vulnerability aggravating factor where multiple defendants beat an adult male to death after knocking him to the ground. *Gordon*, 172 Wn.2d at 674-75, 680.

Here, DR was not a typical seven-year-old boy who had achieved a recognized "level of reason"[44] such that he could repel or resist Williams' abuse. On the contrary, DR was a special education student who likely had undiagnosed learning disabilities, was failing in school, did not know his ABC's or how to count to 10, and was performing below grade level. As in *Ross*, Williams inflicted his abuse when he was alone in the home with DR or while DR's mother was sleeping. He also routinely beat DR after making him strip naked and binding his wrists, mouth,

---

[44] *Woody*, 48 Wn. App. at 777.

and eyes, which, much like the circumstances in *Gordon*, rendered DR incapable of repelling Williams' attacks or fleeing. Under these circumstances, the jury could reasonably infer that DR was particularly vulnerable or incapable of resistance, that Williams knew or should have known about DR's particular vulnerability, and that such vulnerability was a substantial factor in Williams' accomplishing his crimes. We hold, therefore, that sufficient evidence supports Williams' aggravating factor based on victim vulnerability, which justified Williams' exceptional sentence.[45]

### III. Remaining SAG Issues

#### A. Matters Outside the Record

Williams asserts that the State's search warrant was insufficiently particular in describing the items to be seized from his home. The record does not include a copy of the State's search warrant or affidavit for a search warrant. A number of other the issues that Williams raises in his SAG also depend on matters outside the record before us in this direct appeal. These matters include his assertions that (1) the photographs of DR were "doctored" and deliberately designed to elicit jury prejudice, SAG at 2; (2) DR's forensic interview was mishandled, based on the Department of Justice recommendation that such interviews be video recorded and that a child be interviewed only once; and (3) DR's grandmother fabricated the child abuse allegations because Williams and DR's mother were trying to obtain custody of DR.

---

[45] We reiterate that the trial court specifically ruled at sentencing that "each of these aggravating factors by themselves would justify the sentence" and that it would "impos[e] the same sentence even if there was just one" of these three aggravating factors. VRP (June 27, 2011) at 5.

Because these issues rely on matters outside the record, we cannot consider them in this direct appeal. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). They are more properly raised in a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

### B. "Spanking" as Assault

Williams' fourth SAG assertion is that spanking as part of parental discipline cannot be a criminal assault of a child as a matter of law where the spanking "never even elicited an 'ow!' or a tear." SAG at 3. This assertion does not call for reversal for two reasons: First, as a matter of law, even a so-called "simple spanking" can constitute assault of a child when it

> causes bodily harm that is greater than transient physical pain or minor temporary marks, and the person has previously engaged in a pattern or practice either of (i) assaulting the child which has resulted in bodily harm that is greater than transient pain or minor temporary marks, or (ii) causing the child physical pain or agony that is equivalent to that produced by torture.

RCW 9A.36.130(1)(b).

Second, as a matter of fact, the record shows that Williams' so-called repeated "spankings" of DR, sometimes with a belt on DR's naked body and at least once throwing DR into a bookcase, resulted in "[m]assive bruising" all over his body, including bruises on his scrotum, penis, and buttocks; two black eyes, blood and bruising in both eyes; and a missing tooth. 1 VRP at 85; CP at 52. The medical witnesses who examined DR described these injuries as the result of child abuse and "nonaccidental trauma," not normal childhood accidents. 1 VRP at 29. DR reported that when Williams "[got] mad," Williams taped DR's mouth shut, bound his wrists together, placed electric tape over his eyes, dunked his head in cold water, shoved his head in a toilet, and beat him repeatedly with a belt. 2 VRP at 143. These injuries and repeated abuses clearly fall within the statutory definition of "bodily harm that is greater than transient

physical pain or minor temporary marks, . . . or . . . causing the child physical pain or agony that is equivalent to that produced by torture." RCW 9A.36.130(1)(b).

### C. Challenges to Jury's Implied Findings

In the remainder of his SAG (SAG numbers 9, 10-14), Williams challenges the jury's implied findings on witness credibility, the weight given to witness testimony, and whether the State met its ultimate burden of proving the elements of his crime beyond a reasonable doubt.[46] As we have already noted, the persuasiveness, credibility, and weight of the evidence are matters for the trier of fact and are not subject to review by this court. *See State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990); *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992). For this reason, Williams' remaining SAG assertions do

---

[46] More specifically, Williams asserts that (1) he cannot be guilty of assault for "simple spanking," SAG at 3; (2) he did not have two bookcases butted up against each other, and DR "had no bruises that would have been consistent with an impact against a bookcase," SAG at 8; (3) DR's bruising pattern did not match the prosecutor's explanation about how the bruises had occurred, so the jury should have given more weight to his (Williams') testimony; (4) his cell phone photographs were "useless" to prove his crime because they showed that DR was "happier" during his stay with Williams, SAG at 12; (5) the duct tape and electric tape seized from his (Williams') home were never fingerprinted, and no witnesses identified the belts as the ones he had actually used to spank DR; (6) "[a]ny assault victim will present with one eye more swollen than the other," so Dr. Feldman's testimony was not credible, SAG at 14; (7) the allegation that Williams "choked" DR by wrapping his hand around his neck is "laughable" because, although DR had bruises on his neck, the bruises were not shaped like fingerprints, SAG at 16; (8) it is unlikely that DR would have pointed out the bruises on his neck without being coached because he could not see them; and (9) when asked in court who had harmed him, DR failed to identify Williams.

No. 42319-7-II

not support reversal of his conviction.

We affirm Williams' conviction and exceptional sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Hunt, J.

We concur:

_____
Johanson, A.C.J.

_____
Bjorgen, J.

33